365 A.2d 853

COMMONWEALTH of Pennsylvania

v.

James BROWN, Appellant.

COMMONWEALTH of Pennsylvania

v.

Ricky LOVE, Appellant.

Superior Court of Pennsylvania.

Nov. 22, 1976.

John J. Dean, Lester G. Nauhaus, John R. Smith, Public Defender, Pittsburgh, for appellant.

John J. Hickton, Dist. Atty., Robert L. Eberhardt, Louis R. Paulick, Asst. Dist. Attys., Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

After a non-jury trial, appellants were convicted of theft by deception and criminal conspiracy, and were sentenced to terms of imprisonment. In these consolidated appeals, appellants contend that they were arrested without probable cause and therefore their motions to suppress should have been granted. The Commonwealth "concedes that probable cause was lacking at that time but instead maintains that the placing of appellants in the police van constituted a brief stop of a suspicious individual in order to maintain the status quo while obtaining more information." (Brief of Appellee at 4)

The testimony adduced at the suppression hearing showed that at approximately 3:30 A.M. on October 8,

1974, Officers Fetherolf and Chergi, plainclothes officers of the Pittsburgh police, were on patrol in the 900 block of Liberty Avenue when they saw appellants and one Abraham Robinson "conversing in a small huddle." (N. T. 7) Officer Fetherolf saw that appellant Brown was holding a brown paper bag. (*Id.*) Although the officer did not see the contents of the bag (N.T. 13, 14), he surmised that appellants were engaging in a scheme known as the "carnival-ring game."[1] The officer explained that the "carnival-ring game" was commonplace in downtown Pittsburgh (N.T. 7), and that he regarded Robinson, who was significantly older than appellants, as a likely victim. (N.T. 14)

The officers next observed appellants and Robinson walk down Liberty Avenue and enter the Hi Boy restaurant. (N.T. 8) Approximately five minutes later, the officers saw appellants run out of the restaurant. Thinking that the restaurant had been robbed, they chased appellants to a nearby parking lot (N.T. 8), where Officer Fetherolf searched appellants for weapons.[2]

In response to the officers' radio call, a police "paddy wagon" manned by Officers Belansky and Lowery came to the scene. Appellants were placed in the wagon, which left for the police station. (N.T. 24) Officer Fetherolf went to the restaurant, where he learned that Robinson had been the victim of a confidence scheme that resulted in the theft of his wallet.[3] Officer Fether-

1. As explained by Officer Fetherolf: "[T]hey spot some victim, say they have a stolen ring worth a lot of money, with a high price tag, and actually it's cheap rings and cheap watches in some cases." (N.T. 7)

2. The search was apparently broader than a pat-down of appellants' outer clothing. Officer Fetherolf described the search as a "quick body search for weapons." (N.T. 9, 17)

3. As explained by the Commonwealth's brief (at 3): "[T]he method used to obtain the wallet from the victim was what is commonly known as the 'pigeon drop game.' The confidence man persuades the victim to place his wallet into a paper bag along

olf made a radio call to Officers Belansky and Lowery, who by then had arrived at the police station and had placed appellants in a cell room. At Officer Fetherolf's request, Officers Lowery and Belansky searched the wagon, discovering Robinson's stolen wallet, a brown paper bag, and cut-up newspaper (N.T. 12, 25, 26).

The Commonwealth correctly concedes that the officers did not have probable cause to arrest appellants at the time they placed appellants in the police wagon. The officers could not see the contents of the paper bag as they observed appellants and the victim from a distance of seventy to ninety feet (N.T. 13, 14), and therefore could only speculate as to what appellants were doing; and although they saw appellants run out of the restaurant, flight alone does not yield probable cause to arrest. *Commonwealth v. Jeffries*, 454 Pa. 320, 311 A.2d 914 (1973).

This is not to say that the officers were without recourse. Their suspicions, and appellants' apparent flight, would have justified them in stopping appellants and, after a protective search for weapons, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), investigating further. An officer who lacks probable cause to arrest may make " '[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information . . .' " *Commonwealth v. Pegram*, 450 Pa. 590, 596 n. 4, 301 A.2d 695, 699 n.4 (1973), *quoting Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

In the instant case, however, the police did not adopt such an "intermediate response." *Id.* Instead, they placed appellants in a police wagon, took them to

with other valuables which the confidence man has placed therein, and then swaps paper bags on the victim, leaving the victim with a bag containing a folded-up newspaper or some other such worthless item."

the police station, and put them in a cell room. On these facts it is quite impossible to maintain that appellants were not under arrest. *Commonwealth v. Kloch,* 230 Pa.Super. 563, 573, 327 A.2d 375, 381 (1974).

The judgments of sentence are reversed, and the cases are remanded for a new trial consistent with this opinion.

CERCONE, J., concurs in the result.

VAN der VOORT, J., dissents.