381 A.2d 483

COMMONWEALTH of Pennsylvania, Appellee,

v.

Edith Marie BLEWITT, and Emil Amos Dolfi, Appellants.

Superior Court of Pennsylvania.

Submitted Nov. 8, 1976.

Decided Dec. 28, 1977.

Richard H. Martin, Pittsburgh, for appellants.

Robert E. Colville, District Attorney, Pittsburgh, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

This case is before us on appeals taken from judgments of sentence of the Court of Common Pleas of Allegheny County, Criminal Division. Appellants were convicted, in a joint trial, of criminal conspiracy and operating a lottery. Although they were separately represented below, they have, with our permission, consolidated their appeals and filed a joint brief.

The arrests in this matter were made as a result of a three-day surveillance of the parking lot of Maracini's Supermarket in Clairton, Pennsylvania in April of 1975. These were the events observed from a distance of some fifty yards:

First day: While one Gaylord Rumble[1] loitered around the store entrance, a brown Oldsmobile owned by one Joyce Gracon and occupied by an unidentified white woman pulled into the lot. Rumble took some "white papers" from his jacket pocket and handed them to the woman. They separated and both left the lot.

Second day: Rumble was parked in the lot. A Lincoln Continental operated by appellant Dolfi came in. They got out of their cars, Rumble handed Dolfi "some white pieces of paper," and they both drove off.

Third day: The Oldsmobile drove in, followed in five minutes by Rumble and in another five minutes by Dolfi. Dolfi exited his vehicle to converse with Rumble, and then both men conversed with the woman in the Oldsmobile. Nothing was passed, and all three left shortly thereafter.

On the fourth day, police officers waited near the parking lot, armed with search warrants for the three cars involved and an arrest warrant for Gaylord Rumble. For the first time, binoculars were used. Dolfi drove in to the parking lot with a baby. The Oldsmobile came in and Dolfi passed the baby to the woman inside. Dolfi left; his car was stopped shortly thereafter. Rumble came into the lot and handed the woman a white envelope. He left, was apprehended within the half hour, and numbers slips were seized from him. The Oldsmobile left the lot and was soon stopped by a police officer who got into the car and told Mrs. Blewitt, the driver, to drive to the office of a local magistrate. At the magistrate's office the car was searched.[2] As one of the participating officers recounted at the suppression hearing:

1. Mr. Rumble was convicted in the same proceeding, but filed no post-trial motions and took no appeal.

2. The search of the car yielded no evidence.

"As we began our search, the baby and Mrs. Blewitt was standing on the sidewalk next to the car and the baby began to fuss somewhat. In fact, I think the baby started to cry or the baby began to fuss. Anyway, the Chief and I talked and we thought it was in the best interest that she take the baby inside, which the Chief did, proceed inside with Mrs. Blewitt."

While the Chief of Police waited for a policewoman to arrive to search Mrs. Blewitt, he noticed a brown paper bag behind the bib of the baby's overalls. He pulled it out. It contained numbers slips.

■ Mrs. Blewitt contended below and contends now that this evidence is the fruit of an illegal arrest and, therefore, inadmissible.[3] As the arrest was the result of the execution of the search warrant for the Oldsmobile, we must determine whether the warrant was based upon probable cause. We find that it was not.

The only evidence as to the Oldsmobile worth discussing is the observation made on the first day of the surveillance. We do not think that the mere passing of white paper, observed without magnification from a distance of at least fifty yards, can be considered to constitute probable cause, defined as follows in *Commonwealth v. Jeffries*, 454 Pa. 320, 323, 311 A.2d 914, 916 (1973):

" '[F]acts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information, sufficient in themselves to warrant a man of reasonable caution to believe an offense has been or is being committed, and the person to be arrested has committed the offense.' "

White paper is too common a commodity to justify the arrest of every person seen passing it in an unidentifiable form. "White pieces of paper," as they are described in the warrant, may be pieces of mail, checks, sales slips, raffle

---

**3.** The court below held that only the child—later identified as Mrs. Blewitt's two-and-a-half year old granddaughter—had standing to challenge the legality of the search. The Commonwealth concedes that this was error, and we agree.

tickets, food coupons, or a great variety of other things; and, the warrant's conclusory characterization of Gaylord Rumble as a "known numbers writer," in the absence of any information as to its factual underpinnings, is entitled to no weight in our determination of the legality of the search and seizure.

■ We perceive no intervening circumstances that would provide an independent basis for Mrs. Blewitt's arrest[4] or the subsequent search. The Commonwealth argues for the application of the plain view doctrine, stated in *Jeffries*, 454 Pa. at 327, 311 A.2d at 918, as follows:

> "[O]bjects falling in the plain view 'of an officer who has a right to be in the position to have that view' are admissible evidence. . . . [I]nherent in the plain view doctrine is the principle the seized object must not have been put in plain view as a result of unlawful police conduct."

In the instant case, however, an illegal arrest made the view possible. Accordingly, we must reject the Commonwealth's contention.

The Commonwealth also argues that the admission of the slips into evidence was harmless error as Mrs. Blewitt was proven to be a co-conspirator with Gaylord Rumble, numbers slips were lawfully seized from him, and his actions in furtherance of the conspiracy were attributable to her. On this record, however, we are unable to conclude beyond a reasonable doubt that the result would have been the same without the tainted evidence. The Commonwealth will have an opportunity to prove its contention that the evidence in question made no difference at the new trial we grant Mrs. Blewitt.

■ Appellant Dolfi's sole contention is that he was convicted upon insufficient evidence. He never filed a motion

4. In view of the police testimony below that Mrs. Blewitt was not free to leave while the car was being searched and that a policewoman had been summoned to search her, we cannot agree with the lower court's conclusion that she was not under arrest at the time of the seizure.

to suppress evidence, and he does not contend that the numbers slips taken from the person of Mrs. Blewitt's grandchild were inadmissible against him. Thus, as to him, they were competent evidence entitled to the same weight they would be given had they not been seized illegally. While the events observed in the parking lot are, as we have concluded *supra*, a flimsy basis for a belief that a crime has been committed, they do establish that the people observed were involved in some sort of joint enterprise. The numbers slips subsequently acquired remove any doubt as to what sort of enterprise this was. Therefore, we reject appellant Dolfi's sufficiency argument.

The judgment of sentence in the case of Mrs. Blewitt is reversed and a new trial ordered; the judgment of sentence in the case of Mr. Dolfi is affirmed.

VAN der VOORT, J., concurs in the result.

PRICE, J., would affirm both judgments of sentence.

SPAETH, J., files a concurring and dissenting opinion in which HOFFMAN, J., joins.

SPAETH, Judge, concurring and dissenting:

I agree that appellant Blewitt is entitled to a new trial, but I should discharge appellant Dolfi. The evidence against Dolfi was insufficient in that the Commonwealth failed to show that when he handed the baby to Mrs. Blewitt, the numbers slips were in the baby's overalls. It is entirely possible that they were not, and that Mrs. Blewitt hid them there. Therefore the convictions * are "based wholly on inferences, suspicion and conjecture," *Common-*

---

* I grant that the conspiracy conviction presents a closer question than does the lottery-operating conviction. Dolfi's behavior on the second, third, and fourth days were somewhat "fishy" and indicates that he was involved in some way with Blewitt and Rumble, who turned out to be allied in a criminal conspiracy. I still find, however, that this evidence rises no higher than suspicion or conjecture, and certainly not so high as to prove guilt beyond a reasonable doubt.

*wealth v. Simpson,* 436 Pa. 459, 464, 260 A.2d 751, 754 (1971), and should not stand.

HOFFMAN, J., joins in this opinion.